UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| ERICA ESQUIVEL, JOSHUA WALLACE on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>Defendant. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Erica Esquivel ("Plaintiff Esquivel") and Joshua Wallace ("Plaintiff Wallace") (collectively "Plaintiffs"), bring this action on behalf of themselves and all others similarly situated, against The Procter & Gamble Company ("Defendant", "Procter & Gamble" or "P&G"). Plaintiffs make the following allegations based upon (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## INTRODUCTION

1.     This class action arises out of P&G's manufacture, distribution, and sale of Old Spice and Secret brand antiperspirant, deodorant, and body sprays (the "Contaminated Sprays") without disclosing that they contain high levels of benzene, a known human carcinogen.

2.     P&G manufactured, distributed, and sold the Contaminated Sprays throughout the United States. On November 3, 2021, pharmaceutical testing laboratory Valisure submitted a Citizen Petition[1] (the "Valisure Petition") to the Food and Drug Administration (the "FDA") requesting the FDA initiate a recall of certain products, including the Old Spice and Secret

---

[1] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Body-Spray-v4.0-3.pdf.

branded Contaminated Sprays, due to the presence of dangerous amount of the carcinogen benzene.

3.     The Valisure Petition contains the results of testing conducted by Valisure which found that many Old Spice and Secret brand sprays contained what Valisure determined to be unsafe levels of benzene. Valisure arrived at this conclusion by comparing the levels of benzene found in the Contaminated Sprays with guidelines established by the FDA for "drug product[s] with a significant therapeutic advance" of 2 parts per million ("ppm"). Valisure found that the Contaminated Sprays often contained benzene well more than the 2ppm limit.

4.     Benzene is a known human carcinogen.[2] Benzene is proven to cause cancer in humans, including blood cancers such as leukemia.[3] In addition to cancer, direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation.[4] Because of these proven effects, the FDA has adopted a limit for benzene in products of 2 parts per million (ppm).[5]

5.     P&G knew or should have known of the dangerous and carcinogenic effects of benzene and should have known that it was producing products that contained benzene. Nevertheless, P&G produced, distributed, and sold millions of Old Spice and Secret sprays that contained benzene.

6.     On November 23, 2021, P&G announced a "voluntary" recall of certain Old Spice and Secret sprays.[6] In a statement, P&G admitted that their manufacturing process resulted in the

---

[2] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last accessed July 19, 2021).

[3] *Id.*

[4] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last accessed July 19, 2021).

[5] *Id.*

[6] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice.

benzene contamination, stating: "[P&G's] manufacturing partner identified an issue with their propellant supply and is implementing additional measures to address the issue identified in the investigation[.]"[7]

7.      Plaintiffs are purchasers and users of the Contaminated Sprays. Plaintiffs purchased the Contaminated Sprays to treat conditions the Contaminated Sprays were intended to treat and used the Contaminated Sprays in accordance with the directions provided on their packaging. Plaintiffs did so because they believed the Contaminated Sprays had been manufactured using acceptable standards and practices and that they were safe for human use. However, the Contaminated Sprays are toxic, dangerous, unmerchantable products unfit for their intended purpose and use. Plaintiffs and the Class would not have purchased and used the Contaminated Sprays had they known they were unsafe and have, therefore, not received the benefit of their bargain.

8.      Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages or equitable relief for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of the consumer protection statutes of the states of which Plaintiffs are citizens; (iv) negligent failure to warn (v) fraudulent concealment; and (vi) unjust enrichment.

## **PARTIES**

9.      Plaintiff Erica Esquivel is a citizen and resident of Sutter County, California.

10.     Plaintiff Joshua Wallace is a citizen and resident of Los Angeles County, California.

---

[7] https://www.bloomberg.com/news/articles/2021-11-23/p-g-recalls-old-spice-secret-sprays-after-carcinogen-found

11.     Defendant The Procter & Gamble Company is an Ohio corporation with its principal place of business located in Cincinnati, Ohio.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), because this is a class action with aggregate claims exceeding $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Class are citizens of states different from the Defendant.

13.     The Court has personal jurisdiction over the Defendant P&G. P&G is incorporated in Ohio and maintains its principal place of business in Ohio. P&G is therefore subject to general jurisdiction in Ohio.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendant P&G resides in this District. Venue is also proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965, because Defendant P&G transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this complaint took place within this District.

## FACTUAL BACKGROUND

### I.     OLD SPICE & SECRET BRAND SPRAY PRODUCTS

15.     The Old Spice brand was created in the 1930's. Although initially focused on women's fragrances, Old Spice enjoyed early success with its male fragrance line and therefore has traditionally focused on male consumers. P&G purchased the Old Spice fragrances, skin care, deodorant, and antiperspirant brands in June 1990. P&G expanded Old Spice brand offerings to include spray versions of antiperspirants, deodorants, and body sprays in several scents.

16. The Secret brand was created by Procter & Gamble in the 1950's, when P&G launched Secret as the first female deodorant. Secret has offered an aerosolized deodorant spray since 1964. Today, Secret's offerings include several antiperspirant, deodorant, and body sprays. Benzene is not a listed ingredient on the labels of any of the Old Spice or Secret Contaminated Sprays manufactured, distributed, or sold by P&G.[8] The labels of the Old Spice and Secret brand Contaminated Sprays do not warn consumers that the products may contain benzene, nor do they list benzene as an ingredient.

## II.     REGULATION OF OVER-THE-COUNTER DRUG PRODUCTS

17. Antiperspirants, including those in spray form, are considered over-the-counter drug products subject to regulation by the FDA via the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. § 301 et seq., and corresponding state statutes and regulations.

18. Drug products are subject to the FDA's Current Good Manufacturing Practice regulations (the "CGMP Regulations"). The CGMP Regulations "contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product … [these] regulations make sure that a product is safe for use, and that it has the ingredients and strength it claims to have.[9]

19. Drug products whose manufacture does not comply with the with CGMP Regulations are considered "adulterated" or "misbranded" and may not be distributed or sold in the United States.[10]

---

[8] *See, e.g.*, https://smartlabel.pg.com/00012044045114.html (label information for Old Spice Aluminum Free Body Spray for Men, Swagger, 5.1 Oz).

[9] https://www.fda.gov/drugs/pharmaceutical-quality-resources/current-good-manufacturing-practice-cgmp-regulations

[10] *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B)

20.    A drug product whose manufacture, processing, packing or holding does not comply with CGMP Regulations is considered "adulterated" or "misbranded.[11] The Federal Food, Drug, and Cosmetic Act prohibits "the introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."[12] Because adulterated and misbranded products may not be sold to consumers or introduced into interstate commerce in any way, they are effectively worthless.[13]

### III.    BENZENE

21.    Benzene is a colorless, flammable liquid which can occur from natural processes such as forest fires or volcanoes, or from artificial human manufacturing activities.[14]

22.    Benzene can be absorbed through the skin during contact with a source of benzene.[15]

23.    Benzene is a known human carcinogen, meaning that it is known to cause cancer. Studies have shown that rates of leukemia are higher in humans exposed to high levels of benzene.[16] Studies have also suggested links to the following cancers: (1) childhood leukemia; (2) acute lymphocytic leukemia; (3) chronic lymphocytic leukemia; and (4) other blood-related cancers such as multiple myeloma and non-Hodgkin lymphoma in adults (collectively, "Benzene-caused Cancer(s)").[17]

---

[11] The Federal Food, Drug, and Cosmetic Act (FD&C Act) prohibits, among other things, "[t]The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."[11]21 U.S.C. §§ 331(a); 351(a)(2)(B)

[12] *Id.*

[13] *See* 21 U.S.C. § 331(a).

[14] https://www.cancer.org/cancer/cancer-causes/benzene.html

[15] *Id.*

[16] *Id*.

[17] *Id.*

24.     Lab studies on labs rats and mice have shown that when benzene is inhaled or swallowed it causes different types of tumors to develop.[18] These results support the finding of an excess risk of leukemia in humans.[19]

25.     The United States Department of Health and Human Services (DHHS) has determined that benzene causes cancer in humans.[20] Long-term exposure to high levels of benzene in the air can cause leukemia, cancer of the blood-forming organs.[21]

26.     Similarly, the World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."

27.     Benzene's carcinogenic effects are why the FDA classifies benzene as a "Class 1 solvent", meaning that benzene "should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity ... However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted" and benzene is restricted under such guidance to 2 parts per million ("ppm").

28.     The National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.

---

[18] *Id.*

[19] *Id.*

[20] https://emergency.cdc.gov/agent/benzene/basics/facts.asp

[21] *Id.*

## SUBSTANTIVE ALLEGATIONS

### IV.    P&G'S OLD SPICE & SECRET SPRAY PRODUCTS ARE CONTAMINATED WITH BENZENE.

29.    On November 3, 2021, pharmaceutical testing company Valisure filed a Citizens Petition detailing results of Valisure's testing of several brands' deodorant, antiperspirant, and body sprays, including several types of Old Spice and Secret sprays. The Valisure Petition shows that Old Spice and Secret spray deodorants, antiperspirants, and body sprays are contaminated with unsafe levels of benzene.

30.    Valisure tested 108 unique batches of body spray products from 30 brands. Valisure found detectable levels of benzene in 59 of those 108 batches. Valisure found average concentrations of benzene over 2.00 ppm in 24 of those batches. Nine of those 24 batches were either Old Spice or Secret brand sprays.

31.    The fact that no detectable levels of benzene were found in 49 of the 108 batches tested shows that it is not impossible to keep benzene out of these products.

32.    Valisure's test results concerning Old Spice and Secret products can be found in the table below:

| Brand | UPC | Lot | Exp. Date | Type | Description | Avg. level of benzene (ppm) |
|-------|-----|-----|-----------|------|-------------|------------------------------|
| Old Spice | 012044001912 | 11671458SQ | 6/23 | Antiperspirant | Pure Sport | 17.7 |
| Old Spice | 012044001912 | 11671458SB | 6/23 | Antiperspirant | Pure Sport | 17.4 |
| Old Spice | 037000695707 | 246144504 | N/A | Deodorant | Below Deck, Powder Spray, Feel Drier & Cleaner, Down Below, Fresh Air | 5.22 |
| Old Spice | 037000730347 | 11001458SC | 4/23 | Antiperspirant | Sweat Defense, Stronger Swagger, Dry Spray, Sweat & Odor Protection | 4.54 |
| Old Spice | 012044001912 | 12631458SB | 9/23 | Antiperspirant | Pure Sport | 3.34 |

| Secret | 037000711087 | 11721458SG | 6/23 | Antiperspirant | Powder Fresh, 24 HR Aerosol | 16.2 |
| Secret | 037000711087 | 11701458SH | 6/23 | Antiperspirant | Powder Fresh, 24 HR Aerosol | 16.1 |
| Secret | 037000711094 | 12181458SD | 8/23 | Antiperspirant | Powder Fresh, 24 HR Aerosol | 12.5 |
| Secret | 037000798842 | 11091458SN | 4/23 | Antiperspirant | Cool Light & Airy Smooth Feel, Dry Spray, 48 Hour Freshness, Rose | 4.85 |
| Secret | 037000798842 | 11991458SR | 7/23 | Antiperspirant | Cool Light & Airy Smooth Feel, Dry Spray, 48 Hour Freshness, Rose | 2.58 |

33.     Old Spice and Secret products had the four highest levels of benzene detected in any of the 108 batches analyzed by Valisure and five of the highest six.

34.     On November 23, 2021, P&G admitted for the first time that some of its spray deodorants, antiperspirants, and body sprays, including the Contaminated Sprays, contained unsafe levels of benzene and that P&G w and were being recalled. P&G blamed the contamination on its manufacturing partner and stated that an issue with the propellant used led to the contamination.

### A.  P&G VIOLATED CGMP REGULATIONS, COMMON LAW, AND STATE CONSUMER PROTECTION STATUTES IN THE MANUFACTURE, PROCESSING, PACKING, AND DISTRIBUTION OF THE CONTAMINATED SPRAYS.

35.     Benzene is not a listed ingredient on the label of any Contaminated Spray, meaning that benzene's presence in the Contaminated Sprays can be attributed to P&G's failings in the manufacturing, processing, and/or packing of the Contaminated Sprays.

36.     Despite P&G's obligations with respect to manufacturing, processing, and packing described above, P&G failed to comply with the CGMP Regulations, or with their

common law and state statutory obligations in introducing the Contaminated Sprays into the stream of commerce.

37.     P&G, as the manufacturer, processor, packer, distributor, and seller of the Contaminated Sprays had (and still has) an ongoing duty to ensure the Contaminated Sprays did not contain dangerous levels of benzene.

38.     Had P&G complied with the CGMP Regulations and its duties under state law to observe manufacturing, processing, and packing best practices, benzene would not have made its way into the Contaminated Sprays.

39.     Further, had P&G adopted adequate testing procedures to ensure that products it was introducing into the stream of commerce did not contain dangerous carcinogens such as benzene, it would have discovered that its manufacturing, processing, and/or packing processes were deficient and would have detected benzene in its products and prevented their introduction into the stream of commerce.

40.     P&G's failures described above allowed benzene to be present in the Contaminated Sprays. This means the Contaminated Sprays are "adulterated" as the term is used by the FDCA as they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[22]

---

[22] 21 U.S.C.§ 351(a)(1).

41.     The Contaminated Sprays are also "misbranded" as the term is used in the FDCA, because the Contaminated Spray labels do not disclose the presence of benzene, rendering them "false" and "misleading." 21 U.S.C. § 352(a)(1).

42.     As a result of P&G's failure to keep benzene out of the Contaminated Sprays, millions of consumers, including Plaintiffs, have been exposed to dangerous levels of benzene, a known carcinogen, daily by simply following the directions found on the packaging of the Contaminated Sprays.

## V.     CONSUMERS ARE ENTITLED TO REFUNDS FOR THEIR CONTAMINATED SPRAY PURCAHSES.

43.     Plaintiffs purchased the Contaminated Sprays without knowing or having reason to know that the Contaminated Sprays contained dangerous levels of benzene. Had Plaintiffs known that the Contaminated Sprays contained dangerous levels of benzene, they would not have purchased the Contaminated Sprays at all or would have paid significantly less for the Contaminated Sprays.

44.     Plaintiffs and the Class bargained for deodorant, antiperspirant, and body sprays that conformed with their labels, complied with federal law, and did not contain dangerous levels of carcinogens such as benzene. Plaintiffs were deprived of the benefit of the bargain when they received the Contaminated Sprays which contained dangerous levels of benzene in them.

45.     Plaintiffs and the Class are thus entitled to full refunds for the amounts paid for the Contaminated Sprays they purchased on the basis that they have been deprived of the benefit of their bargain.

## VI.     CONSUMERS REQUIRE MEDICAL MONITORING

### i.  PLAINTIFFS AND CLASS MEMBERS HAVE INCREASED RISK OF CONTRACTING BENZENE-CAUSED CANCER BECAUSE THE CONTAMINATED SPRAYS THEY REGULARLY USED EXPOSED THEM TO UNSAFE LEVELS OF BENZENE.

46.     As alleged below, each Plaintiffs regularly used the Contaminated Sprays as directed on the Contaminated Sprays' labels.

47.     Plaintiffs used Contaminated Sprays manufactured and distributed by P&G as directed by the Contaminated Sprays' labels. As the labels included above show, this often meant that Plaintiffs applied the Contaminated Sprays daily and possibly multiple times a day. These products, unbeknownst to Plaintiffs, contained benzene, a known carcinogen.

48.     Based on prevailing scientific evidence, and the classifications adopted by numerous agencies, regulatory bodies, and scientific organizations discussed *supra*, exposure to benzene via skin absorption can cause cancer, including leukemia and other blood-related cancers.

49.     Thus, as a direct and proximate result of using P&G's Contaminated Sprays for years, Plaintiffs are at a significantly increased risk of contracting Benzene-caused Cancers. Plaintiffs' lengthy duration of exposure to benzene from P&G's Contaminated Sprays warrants additional medical testing not routinely provided to the public at large.

### ii.  PLAINTIFFS AND THE CLASS MEMBERS REQUIRE DIAGNOSTIC MEDICAL TESTING THAT DIFFERS FROM ROUTINE MEDICAL CARE.

50.     Physicians evaluate a person's exposure to toxic and carcinogenic substances, including benzene, when determining what diagnostic testing and treatment is necessary.

51.     A reasonably prudent person would conclude that Plaintiffs' repeated exposure to significant, unsafe levels of benzene over lengthy periods of time necessitates specialized testing (with resultant treatments) that is not generally given to the public at large as a part of routine medical care.

52.     The available monitoring regime, discussed in greater detail below, is reasonably necessary and specific for individuals exposed to products known to significantly increase the risk of the Benzene-Caused Cancers because of exposure to benzene. It is different from that normally recommended in the absence of exposure to this risk of harm (whether in kind and/or frequency) and is not generally available in a general practitioner setting.

53.     The available medical monitoring regime will mitigate the development of and health effects associated with the Benzene-Caused Cancers, improving prognosis, outcome, and quality of life, and reducing medical costs.

54.     Consistent with best practices, Plaintiffs seek to implement a medical monitoring program which begins with screening to determine whether more invasive or costly tests are warranted. This screening may be conducted via questionnaire, in-person before a medical practitioner, or via a tele-health appointment.

55.     Medical practitioners will review the questionnaire or the results of a screening appointment to determine whether additional testing, such as a blood test, for purposes of diagnosis is required. Leukemia and other Benzene-Caused Cancers are typically found via blood tests and can be detected before symptoms begin.[23]

---

[23] https://www.mayoclinic.org/diseases-conditions/leukemia/diagnosis-treatment/drc-20374378

56.     Additional testing may include blood tests and/or bone marrow tests.[24] Blood tests allow doctors to determine whether an individual has abnormal levels of red or white blood cells or platelets, which may suggest leukemia, or can show the presence of leukemia cells.[25] Bone marrow tests are used to determine whether leukemia cells which can avoid detection in blood tests are present.[26]

57.     Screening and testing in the medical monitoring program will likely occur for an extended period. This permits the medical practitioners to monitor changes in symptoms or follow anomalies that may appear in tests over time and accommodates latency periods associated with the Benzene-Caused Cancers.

## VII.    PLAINTIFF ALLEGATIONS

### A.    PLAINTIFF ERICA ESQUIVEL

58.     Plaintiff Erica Esquivel is a citizen and resident of Sutter Country, California.

59.     Plaintiff Esquivel purchased and used Contaminated Sprays during the Class Period, including Old Spice Deodorant Sprays in the following scents: Pure Sport and Fiji, as well as Secret brand Deodorant, Antiperspirant, and Body Sprays in the Powder Fresh scent.

60.     Plaintiff Esquivel used each Contaminated Spray she purchased as directed by the Contaminated Spray product labels.

61.     Plaintiff Esquivel would not have purchased or used any Contaminated Sprays had she known that the Contaminated Sprays were at risk of, or did in fact, contain benzene.

---

[24] *Id.*

[25] *Id*.

[26] *Id*.

62. Plaintiff Esquivel was deprived of the benefit of the bargain when she purchased Contaminated Sprays without knowing the Contaminated Sprays were at risk of containing, or did in fact contain, benzene.

63. Plaintiff Esquivel requires medical monitoring to ensure that if she develops any Benzene-caused Cancers or other health conditions because of her use of Contaminated Sprays the conditions are detected early to give hier the best possible chance of having the condition resolve or be treated successfully.

**B.    PLAINTIFF JOSHUA WALLCE**

64. Plaintiff Joshua Wallace is a citizen and resident of Los Angeles County, California.

65. Plaintiff Wallace purchased and used Contaminated Sprays during the Class Period, including Old Spice Deodorant Sprays, Old Spice Antiperspirant Sprays, and Old Spice Body Sprays.

66. Plaintiff Wallace used each Contaminated Spray he purchased as directed by the Contaminated Spray product labels.

67. Plaintiff Wallace would not have purchased or used any Contaminated Sprays had he known that the Contaminated Sprays were at risk of, or did in fact, contain benzene.

68. Plaintiff Wallace was deprived of the benefit of the bargain when he purchased Contaminated Sprays without knowing the Contaminated Sprays were at risk of containing, or did in fact contain, benzene.

69. Plaintiff Wallace requires medical monitoring to ensure that if he develops any Benzene-caused Cancers or other health conditions because of his use of Contaminated Sprays

the conditions are detected early to give him the best possible chance of having the condition

resolve or be treated successfully.

## VIII.   CLASS ALLEGATIONS

70.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a).

### A.   CLASSSES AND SUBCLASSES

71.   Plaintiffs seek certification of the following Classes and Subclasses:

#### i.   ECONOMIC LOSS CLASS AND SUBCLASSES

72.   Plaintiffs seek class certification on behalf of a class defined as follows (the

"Economic Loss Class"):

**ECONOMIC LOSS CLASS:** All individuals who, from the beginning of any applicable limitations period through the present, purchased a Contaminated Spray in the United States.

73.   Plaintiffs seek certification on behalf of a subclass defined as follows:

**CALIFORNIA ECONOMIC LOSS SUBCLASS:** All individuals who were or are citizens of the State of California who, from the beginning of any applicable limitations period through the present, purchased a Contaminated Spray during the Class Period (the "California Economic Loss Subclass").

74.   Plaintiffs seek certification on behalf of a subclass defined as follows:

75.   Plaintiffs reserve the right to modify or refine the definitions of the Economic

Loss Class or Economic Loss Subclasses based upon discovery of new information and to

accommodate any of the Court's manageability concerns.

#### i.   MEDICAL MONITORING CLASSES AND SUBCLASSES

76.   Plaintiffs seek class certification on behalf of a class defined as follows (the

"Medical Monitoring Class"):

**MEDICAL MONITORING CLASS**: All individuals who, from the beginning of any applicable limitations period through the present, purchased and used Contaminated Sprays in the United States and have not been diagnosed with a Benzene-caused Cancer or other health condition

77.     Plaintiffs seek certification on behalf of a subclass defined as follows:

**CALIFORNIA MEDICAL MONITORING SUBCLASS**: All individuals who were or are citizens of the State of California who, from the beginning of any applicable limitations period through the present, purchased and used a Contaminated Spray and have not been diagnosed with a Benzene-caused Cancer or other health condition (the "California Medical Monitoring Subclass")

78.     Plaintiffs reserve the right to modify or refine the definitions of the Medical Monitoring Class or the Medical Monitoring Subclasses based upon discovery of new information and to accommodate any of the Court's manageability concerns.

### B.  FED. R. CIV. P. 23 REQUIREMENTS

79.     **Ascertainability**. The proposed Classes and Subclasses are readily ascertainable because they are defined using objective criteria to allow class members to determine if they are part of a Class or Subclass. Further, the Classes and Subclasses can be readily identified through records maintained by P&G.

80.     **Numerosity (Rule 23(a)(1))**. The Classes and Subclasses are so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class and Subclasses, as herein identified and described, is not known, upon information and belief there are millions of individuals who purchased the Contaminated Sprays.

81.     **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

(a)     whether the Contaminated Sprays contain, or are likely to contain, or exposed the Classes and Subclasses to unacceptable levels of benzene;

(b)     whether exposure to and consumption of Benzene increases the risk of developing any of the Benzene-caused Cancers;

(c)     whether P&G knew or should have known that the Contaminated Sprays contained, or were likely to contain, unacceptable levels of benzene;

(d)     whether P&G knew or should have known that use of the Contaminated Sprays increased the risk of developing any of the Benzene-caused Cancers;

(e)     whether P&G acted to conceal the fact that the Contaminated Sprays expose users to unacceptable amounts of benzene;

(f)     whether P&G acted to conceal the fact that use of the Contaminated Sprays increased the risk of developing cancer;

(g)     whether P&G was negligent in labeling, marketing, advertising, promoting and/or manufacturing and/or selling the Contaminated Sprays;

(h)     whether P&G is liable for failing to warn of the risks associated with use of the Contaminated Sprays;

(i)     whether Plaintiffs, members of the Medical Monitoring Class, and members of the Medical Monitoring Subclasses are entitled to medical monitoring relief as a result of their increased risk of developing the Benzene-Caused Cancers based on use of the Contaminated Sprays; and

(j)     the type and format of medical monitoring relief, declaratory relief and/or injunctive relief that is appropriate.

82.     **Typicality (Rule 23(a)(3))**. Plaintiffs' claims are typical of the claims of the proposed Classes and Subclasses. Plaintiffs and the Classes and Subclasses (as applicable) suffered injuries because of P&G's wrongful conduct that is uniform across the Classes and Subclasses.

83.     **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to represent and protect the interests of the Classes and Subclasses fairly and adequately. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Classes and Subclasses, and P&G has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this

action on behalf of the members of the Classes and Subclasses, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes and Subclasses.

84.     **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes and Subclasses is impracticable. The prosecution of separate actions by individual members of the Classes and Subclasses would impose heavy burdens upon the Courts and P&G, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

85.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

86.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because P&G acted or refused to act on grounds generally applicable to the Classes and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

87. Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**BREACH OF EXPRESS WARRANTY**
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

88. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

89. P&G manufactured, distributed, and sold the Contaminated Sprays into the stream of commerce with the intent that the Contaminated Sprays would be purchased by Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

90. P&G expressly warranted, advertised, and represented to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses that the Contaminated Sprays were safe and appropriate for human use.

91. P&G made these express warranties regarding the Contaminated Sprays quality and fitness for use in writing through its website, advertisements, and marketing materials and on the Contaminated Sprays' packaging and labels. These express warranties became part of the basis of the bargain that Plaintiffs and the Class and Subclasses entered into upon purchasing the Contaminated Sprays.

92. P&G's advertisements, warranties, and representations were made in connection with the sale of the Contaminated Sprays to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses. Plaintiffs, the Economic Loss Class, and Economic Loss Subclasses relied on P&G's advertisements, warranties, and representations regarding the Contaminated Sprays in deciding whether to purchase P&G's products.

93.     P&G's Contaminated Sprays do not conform to P&G's advertisements, warranties and representations in that they are not safe, healthy, and appropriate for human use.

94.     P&G therefore breached its express warranties by placing Contaminated Sprays into the stream of commerce and selling them to consumers, when their use had dangerous effects and was unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by P&G. These associated health effects substantially impair the use, value, and safety of Contaminated Sprays.

95.     P&G was aware, or should have been aware, of the presence of the human carcinogen benzene in the Contaminated Sprays and therefore was aware or should have been aware of the toxic or dangerous health effects of the use of the Contaminated Sprays, but nowhere on the package labeling or on P&G's websites or other marketing materials did P&G warn Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses and the presence of benzene in the Contaminated Sprays or the dangers it posed.

96.     Instead, P&G concealed the presence of benzene in the Contaminated Sprays and deceptively represented that the Contaminated Sprays were safe, healthy, and appropriate for human use. P&G thus utterly failed to ensure that the material representations it was making to consumers were true.

97.     Benzene was present in the Contaminated Sprays when they left P&G's possession or control and were sold to Plaintiffs, members of the Economic Loss Class and Economic Loss Subclasses. The dangers associated with use of the Contaminated Sprays were undiscoverable by Plaintiffs, members of the Economic Loss Class and Economic Loss Subclasses at the time of purchase of the Contaminated Sprays.

98.     P&G is the manufacturer, marketer, advertisers, distributor, and seller of the Contaminated Sprays and thus had exclusive knowledge and notice of the fact that the Contaminated Sprays did not conform to the affirmations of fact and promises.

99.     In addition, or in the alternative, to the formation of an express contract, P&G made each of the above-described representations to induce Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses to rely on such representations.

100.    P&G's affirmations of fact and promises were material, and Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses reasonably relied upon such representations in purchasing the Contaminated Sprays.

101.    All conditions precedent to P&G's liability for its breach of express warranty have been performed by Plaintiffs or members of the Economic Loss Class or Economic Loss Subclasses.

102.    Affording P&G an opportunity to cure its breaches of written warranties would be unnecessary and futile here. P&G had ample opportunity to test its products for benzene and to modify their manufacturing processes to ensure benzene was not present in the Contaminated Sprays to make them safe and healthy for use by Plaintiffs and members of the Economic Loss Class and Subclasses, or recall them, but failed to do so until now.

103.    As a direct and proximate result of P&G's breaches of express warranty, Plaintiffs and members of the Classes and Subclasses have been damaged because they did not receive the products as specifically warranted by P&G. Plaintiffs and members of the Economic Loss Class and Economic Loss Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the Contaminated Sprays.

104. Plaintiffs and the Economic Loss Class and Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for P&G's failure to deliver goods conforming to their express warranties and resulting breach.

<u>**SECOND CLAIM FOR RELIEF**</u>

**BREACH OF IMPLIED WARRANTY**
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

105. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

106. P&G is a merchant engaged in the sale of goods to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

107. There was a sale of goods from P&G to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses.

108. At all times mentioned herein, P&G manufactured, distributed, or supplied Contaminated Sprays, and prior to the time the Contaminated Sprays were purchased by Plaintiffs and the Economic Loss Class and Economic Loss Subclasses, P&G impliedly warranted to them that the Contaminated Sprays were of merchantable quality, fit for their ordinary use, and conformed to the promises and affirmations of fact made on the Contaminated Sprays' labels and packaging, including that the Contaminated Sprays were safe and appropriate for human use. Plaintiffs and the Economic Loss Class and Economic Loss Subclasses relied on P&G's promises and affirmations of fact when they purchased the Contaminated Sprays.

109. Contrary to these representations and warranties, the Contaminated Sprays were not fit for their ordinary use and did not conform to P&G's affirmations of fact and promises as use of the Contaminated Sprays was accompanied by the risk of exposure to benzene and to developing Benzene-caused Cancers which does not conform to the packaging.

110.    P&G breached its implied warranties by selling Contaminated Sprays that failed to conform to the promises or affirmations of fact made on the packaging or label as use of each Contaminated Sprays was accompanied by the risk of exposure to benzene and to developing Benzene-caused Cancers which does not conform to the packaging.

111.    P&G was, or should have been on notice of this breach, as it was on notice that the process used to manufacture the Contaminated Sprays was likely to result in the presence of benzene in the Contaminated Sprays.

112.    Privity exists because P&G impliedly warranted to Plaintiffs and the Economic Loss Class and Economic Loss Subclasses through the warranting, packaging, advertising, marketing, and labeling that Contaminated Sprays were natural, and suitable for use to treat health conditions by individuals and made no mention of the attendant health risks associated with use of the Contaminated Sprays.

113.    As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that each Contaminated Spray they purchased is worth less than the price they paid and that they would not have purchased at all if they had known of the attendant health risks associated with the use of each Contaminated Spray.

114.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for P&G's failure to deliver goods conforming to their implied warranties and resulting breach.

## THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

115.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

116.     P&G falsely represented to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that the Contaminated Sprays did not contain unsafe levels of carcinogens and were safe for human use.

117.     P&G intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses to purchase Contaminated Sprays.

118.     For at least part of the Class Period, P&G knew that its representations about the Contaminated Sprays were false, or that there was a significantly likelihood that they were false, in that the Contaminated Sprays either did contain, or had a significant risk of containing unsafe amounts of the carcinogen benzene which does not conform to the products' labels, packaging, advertising, and statements. P&G knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses.

119.     Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses did in fact rely on these misrepresentations and purchased Contaminated Sprays to their detriment. Given the deceptive way P&G advertised, represented, and otherwise promoted the Contaminated Sprays, the reliance Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses placed on P&G's misrepresentations was justifiable.

120.     As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased

Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known of the risk of the presence of unsafe levels of benzene in the Contaminated Sprays and the health risks, including cancer, associated with the use of the Contaminated Sprays that does not conform with the Contaminated Sprays' labels, packaging, advertising, and statements.

121. Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

### FOURTH CLAIM FOR RELIEF

**FRAUD BY OMISSION**
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

122. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

123. P&G concealed from and failed to disclose to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that use of Contaminated Sprays is accompanied by a risk of exposure to the carcinogen benzene which carries with it the risk of developing Benzene-caused Cancers which does not conform to the products' labels, packaging, advertising, and statements.

124. P&G was under a duty to disclose to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses the true safety, quality, characteristics, fitness for use, and suitability of the Contaminated Sprays because: (1) P&G was in a superior position to know the true state of facts about its products; (2) P&G was in a superior position to know the risks associated with the use of, characteristics of, and suitability of Contaminated Sprays for use by individuals; and (3) P&G knew that Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses could not reasonably have been expected to learn or discover that Contaminated Sprays were misrepresented in the packaging, labels, advertising, and websites prior to purchasing Contaminated Sprays.

125.    The facts concealed or not disclosed by P&G to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase Contaminated Sprays.

126.    Plaintiffs and the Class and Subclasses justifiably relied on the P&G's omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of Contaminated Sprays, which is inferior when compared to how Contaminated Sprays are advertised and represented by P&G.

127.    As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known of the health risks associated with the use of the Contaminated Sprays which do not conform to the Contaminated Sprays' labels, packaging, advertising, and statements.

128.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
### On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses

129.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

130.    P&G had a duty to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of Contaminated Sprays.

131.    P&G breached its duty to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses that did not have the qualities, characteristics, and suitability for use as advertised by P&G and by failing to promptly remove Contaminated Sprays from the marketplace or to take other appropriate remedial action upon becoming aware of the health risks of the Contaminated Sprays.

132.    P&G knew or should have known that the qualities and characteristics of the Contaminated Sprays were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by P&G yet continued selling the Contaminated Sprays. Specifically, P&G knew or should have known that: (1) the manufacturing process used to produce the Contaminated Sprays resulted in the presence of benzene in the Contaminated Sprays or a substantial risk that benzene would be found in the Contaminated Sprays and (2) the Contaminated Sprays were otherwise not as warranted and represented by P&G.

133.    As a direct and proximate result of P&G's conduct, Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses have suffered actual damages in that they purchased Contaminated Sprays that were worth less than the price they paid and that they would not have purchased at all had they known they contained the carcinogen benzene that is known to cause the Benzene-caused cancers which does not conform to the products' labels, packaging, advertising, and statements.

134.    Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**On Behalf of the Economic Loss Class or, alternatively, the Economic Loss Subclasses**

135.　Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

136.　Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses conferred substantial benefits on P&G through their purchase and use of Contaminated Sprays. P&G knowingly and willingly accepted and enjoyed these benefits.

137.　P&G either knew or should have known that the payments rendered by Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses were given with the expectation that the Contaminated Sprays would have the qualities, characteristics, and suitability for use represented and warranted by P&G. As such, it would be inequitable for P&G to retain the benefit of the payments under these circumstances.

138.　P&G's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for P&G to retain the benefits without payment of the value to Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses.

139.　Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses are entitled to recover from P&G all amounts wrongfully collected and improperly retained by P&G, plus interest thereon.

140.　Plaintiffs, the Economic Loss Class, and the Economic Loss Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

**<u>SEVENTH CLAIM FOR RELIEF</u>**

**NEGLIGENT FAILURE TO WARN
On Behalf of the Medical Monitoring Class or, alternatively,
the Medical Monitoring Subclasses**

141.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

142.     Under the laws of California, Delaware, Indiana, Massachusetts, Missouri, and South Carolina, manufacturers, including P&G, have a duty of reasonable care to warn of particular risks that are known or knowable in light of the generally recognized and prevailing scientific and medical knowledge available at the time of manufacture and distribution. P&G breached this duty for its Contaminated Sprays. The warnings included on were inadequate because they did not warn of the presence of benzene in the Contaminated Sprays, of the substantial risk that benzene was in the Contaminated Sprays, or of the fact that exposure to benzene can result in the development of the Benzene-caused Cancers.

143.     Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses or their doctors would have read and heeded these warnings had they been included on the labels and packaging of the Contaminated Sprays. Had such warnings been provided, Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses would have been made aware of the risks of developing the Benzene-caused Cancers associated with exposure to the carcinogen benzene found in the Contaminated Sprays.

144.     As a direct and proximate result of P&G's failure to provide adequate warnings of the risk of exposure to benzene and the risk of development of Benzene-caused Cancers through exposure to benzene, Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses have sustained a significantly increased risk of developing serious and potentially

fatal Benzene-caused Cancers and have suffered and will suffer economic losses and expenses associated with ongoing medical monitoring.

145.     The latent injuries from which Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses suffer require specialized testing (with resultant treatment) that is not generally given to the public at large. The available monitoring regime is specific for individuals exposed to products known to significantly increase the risk of the Benzene-caused Cancers of using Contaminated Sprays and is different from that normally recommended in the absence of exposure to this risk of harm.

146.     The medical monitoring regime should include, but is not limited to, baseline tests and diagnostic examination that will assist in early detection and diagnosing the Benzene-caused Cancers. This diagnostic program will facilitate treatment and interventions that will mitigate the development of, and health effects associated with, the Benzene-caused Cancers.

147.     The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis and treatment of the Benzene-caused Cancers.

148.     By monitoring and testing Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses, the risk of developing and losses arising from suffering from long-term injuries, disease will be significantly reduced.

149.     Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses seek creation of a Court-supervised, P&G-funded medical monitoring program which will facilitate the diagnoses of Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses for the Benzene-caused Cancers. The medical monitoring should include a trust fund

to pay for the medical monitoring and diagnosis of Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses as frequently and appropriately as necessary.

150.    Accordingly, P&G should be required to establish a medical monitoring program that includes, among other things: (a) establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of everyone who has used the Contaminated Sprays for the purpose of diagnosis, as frequently and appropriately as necessary; and (b) notifying all members of the Medical Monitoring Class and the Medical Monitoring Subclasses in writing that they may require frequent medical monitoring for the purpose of diagnosis.

151.    Plaintiffs, the Medical Monitoring Class, and the Medical Monitoring Subclasses have an inadequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to using the Contaminated Sprays tainted with the carcinogen benzene. Without a court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs, the Medical Monitoring Class, the State Medical Monitoring Subclasses will continue to face an unreasonable risk of injury and disability and remain undiagnosed.

## EIGHTH CLAIM FOR RELIEF

### CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1750 *et seq.*
### On Behalf of Plaintiffs and the California Economic Loss Subclass

152.    Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

153.    Plaintiffs and the California Economic Loss Subclass have provided P&G notice of the specific complaint and damages in accordance with Cal. Civ. Code § 1761. Subject to the response, if any, by P&G within the statutorily prescribed period, Plaintiffs, on behalf of

themselves, the Classes and Subclasses, shall amend the Complaint to include this Claim for Relief and demand all appropriate relief under the CLRA.

154.    Plaintiffs and the California Economic Loss Subclass are "consumer[s]" as that term is defined in Cal. Civ. Code § 1761(d).

155.    The Contaminated Sprays are "goods," as that term is defined in Cal. Civ. Code § 1761(a).

156.    P&G is a "person" as that term is defined in Cal. Civ. Code § 1761(c).

157.    Each purchase of a Contaminated Spray by Plaintiffs and the California Economic Loss Subclass constituted a "transaction" as that term is defined in Cal. Civ. Code § 1761(e).

158.    P&G's conduct alleged herein violates the following provisions of California's Consumer Legal Remedies Act (the "CLRA"):

  A. Cal. Civ. Code § 1770(a)(5), by negligently, recklessly, and/or intentionally representing that the Contaminated Sprays were and are safe for use by individuals when in fact they contain an unsafe chemical, benzene, which could cause a Contaminated Spray user to develop Benzene-caused cancers.

  B. Cal. Civ. Code § 1770(a)(7), by negligently, recklessly, and/or intentionally representing that the Contaminated Sprays were of a particular standard, quality, or grade, when they were of another;

  C. Cal. Civ. Code § 1770(a)(9), by negligently, recklessly, and/or intentionally advertising the Contaminated Sprays with intent not to sell them as advertised; and

  D. Cal. Civ. Code § 1770(a)(16), by representing that the Contaminated Sprays have been supplied in accordance with previous representations when they have not.

159.    As a direct and proximate result of these violations, Plaintiffs and the California Economic Loss Subclass have been harmed by the misleading marketing described herein in any manner in connection with the advertising and sale of the Contaminated Sprays.

160.    Plaintiffs and the California Economic Loss Subclass seek relief for the injuries they have suffered because of P&G's practices, as provided by the CLRA and applicable law.

### NINTH CLAIM FOR RELIEF

**CALIFORNIA'S FALSE ADVERTISING LAW**
**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**
**On Behalf of Plaintiffs and the California Economic Loss Subclass**

161.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

162.    California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

163.    As set forth herein, P&G's claims that the Contaminated Sprays were and are safe for use by individuals were false because the Contaminated Sprays in fact they contain an unsafe chemical, Benzene, which could cause a Contaminated Spray user to suffer adverse health effects from use of the Contaminated Sprays and were likely to deceive the public.

164.    P&G's claims that the Contaminated Sprays were and are safe for use by individuals were and are untrue and misleading because they failed to mention the presence of an unsafe chemical, Benzene, which could cause a Contaminated Spray user to suffer adverse health effects from use of the Contaminated Sprays.

165.    P&G knew, or reasonably should have known, that all these claims were untrue or misleading.

166.    Prospective injunctive relief is necessary given P&G's refusal to offer details as to when they intend to repair the Contaminated Sprays.

167.    Plaintiffs and the California Economic Loss Subclass are entitled to injunctive and equitable relief, and restitution in the amount they spent on the Contaminated Sprays and replacement devices.

## <u>TENTH CLAIM FOR RELIEF</u>

**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**On behalf of Plaintiffs and the California Economic Loss Subclass**

168.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

169.    The California Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code §17200.

170.    P&G fraudulently represented that the Contaminated Sprays were and are safe for use by individuals when in fact they contain an unsafe chemical, benzene, which could cause a Contaminated Spray user to develop cancer from use of the Contaminated Sprays.

171.    As alleged herein, P&G unlawfully advertised the Contaminated Sprays using false or misleading claims, such that P&G's actions as alleged herein violate at least the following laws:

> A.    The California Legal Remedies Act, Cal. Bus. & Prof. Code § 1750 *et seq*.; and
>
> B.    The California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.;

172.    P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is unfair because P&G's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

173.    P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the

California Legal Remedies Act, the California False Advertising Law, and the Florida Deceptive and Unfair Trade Practices Act.

174.    P&G's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Contaminated Sprays is also unfair because the consumer injury is substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

175.    In accordance with Cal. Bus. & Prof. Code § 17203, Plaintiffs and the California Economic Loss Subclass seek an order requiring P&G to immediately repair or replace the Contaminated Sprays.

176.    Plaintiffs and the California Economic Loss Subclass also seek an order for the restitution of all monies from the sale of the Contaminated Sprays, which were unjustly acquired through acts of fraudulent, unfair, or unlawful competition.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against P&G as to each count, including:

A.  An order certifying this action as a class action, certifying the Classes and Subclasses requested herein, designating Plaintiffs as the representatives of the Classes and Subclasses, and appointing Plaintiffs' counsel as counsel to the Classes and Subclasses;

B.  An order declaring that P&G's actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; and (v) negligent failure to warn; (vi) unjust enrichment; and (vii) unfair and deceptive business practices in violation of California's consumer

protection statutes, and that P&G is liable to Plaintiffs, members of the Class, and members of the Subclasses, as described herein, for damages arising therefrom;

C. An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining P&G from continuing the unlawful practices alleged herein, and injunctive relief to remedy P&G's past conduct;

D. A judgment awarding Plaintiffs and members of the Classes and Subclasses all appropriate damages, in an amount to be determined at trial;

E. A judgment awarding equitable, injunctive, and/or declaratory relief as may be appropriate including, but not limited to, restitution, disgorgement, and requiring P&G to develop, implement, and maintain a medical monitoring program as detailed above for members of the Classes and Subclasses.

F. A judgment awarding Plaintiffs and members of the Classes and Subclasses prejudgment and post-judgment interest, as permitted by law;

G. A judgment awarding Plaintiffs and members of the Classes and Subclasses costs and fees, including attorneys' fees, as permitted by law; and

H. Grant such other legal, equitable or further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:       December 8, 2021        Respectfully submitted,

/s/ Joshua R. Cohen
Joshua R. Cohen (0032368)
jcohen@crklaw.com
James B. Rosenthal (0062872)
jbr@crklaw.com
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
One Clinton Place
Cleveland, Ohio 44113
Tel. & Fax 216.815.9500

Steven L. Bloch (*pro hac vice* forthcoming)
Ian W. Sloss (*pro hac vice* forthcoming)
**SILVER GOLUB & TEITELL LLP**
184 Atlantic Street
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com